ON MOTION FOR REVIEW OF STAY ORDER
 

 WETHERELL, J.
 

 Appellee seeks review of the trial court’s order denying her motion challenging the sufficiency of the bond posted by Appellant, R.J. Reynolds Tobacco Company (RJR), pursuant to section 569.23(3), Florida Statutes (2010), to obtain a stay of the judgment in this
 
 Engle
 

 [1]
 

 progeny case. Appellee contends that the bond is insufficient because the statute upon which it is based is unconstitutional. We reject Appellee’s constitutional challenges to section 569.23(3) and affirm the trial court’s order.
 

 Appellee obtained a $15.75 million judgment against RJR in this case. RJR appealed the judgment to this court and obtained an automatic stay of the judgment by posting a $5 million bond in accordance with section 569.23(3), rather than the approximately $17.6 million bond that would have been required for a stay under Florida Rule of Appellate Procedure 9.310(b)(1). Appellee filed a motion with the trial court to determine the sufficiency of the bond and, in that motion, Appellee argued that section 569.23(3) was unconstitutional. The Attorney General was permitted to intervene to defend the constitutionality of the statute. After a hearing, the trial court denied the motion, citing an unpublished order of this court in another
 
 Engle
 
 progeny case
 
 [2]
 
 and the Third District Court of Appeal’s decision in
 
 BDO Seidman, LLP v. Banco Espirito Santo International, Ltd.
 

 [3]
 

 Appellee seeks review of the trial court’s order pursuant to rule 9.310(f).
 
 [4]
 

 As she did below, Appellee contends in her motion for review that section 569.23(3) is unconstitutional because 1) it is a special law granting a privilege to a corporation in violation of article III, section ll(a)(12) of the Florida Constitution, and 2) it impermissibly intrudes on the Florida Supreme Court’s authority to regulate practice and procedure in the courts under article V, section 2(a), thereby violating the separation of powers mandate in article II, section 3. Each claim will be addressed in turn after a brief discussion of the background, history and operation of section 569.23(3).
 

 Background
 

 In 1995, the State of Florida sued RJR and other cigarette manufacturers, asserting various claims for monetary and in-junctive relief.
 
 See State of Fla., et al. v. Am. Tobacco Co., et al.,
 
 Case No. 95-1466 AH, 1996 WL 788371 (Fla. 15th Cir.Ct.).
 
 *1087
 
 The suit was resolved in 1997 through a settlement agreement (commonly referred to as “the FSA”) that, among other things, required RJR and the other settling companies to pay the State approximately $13 billion over 25 years along with additional payments that will continue in perpetuity. The payments have been as high as $765 million and are projected to be approximately $350 million per year in the upcoming fiscal years. The payments are used to fund various state agencies and programs, including the comprehensive statewide tobacco education and prevention program mandated by article X, section 27 of the Florida Constitution.
 
 See
 
 Art. X, § 27(b), Fla. Const. (requiring 15% of the total gross funds that tobacco companies pay the State under the FSA to be used to fund the constitutionally-mandated tobacco education and prevention program).
 

 Starting in 2000, the Florida Legislature passed several statutes in response to concerns about the potential adverse impact of large verdicts in suits filed by individual smokers on the ability of the tobacco companies to continue to make the payments required by the FSA. The clear purpose and intent of these statutes was to protect the State’s pecuniary interest in the revenue stream under the FSA.
 

 In 2000, the Legislature enacted section 768.733, Florida Statutes. This statute established a $100 million cap on the bond or other security required to stay execution of a punitive damage award in a certified class action.
 
 See
 
 § 768.733(2), Fla. Stat. (2000) (limiting the bond to the lesser of the amount of the punitive damages plus interest or 10% of the defendant’s net worth, but in no event more than $100 million). At the time,
 
 Engle
 
 was proceeding as a class action and the jury had awarded $146 billion in punitive damages against RJR and the other defendants in that case. The Legislature was concerned that “the State of Florida itself would be at risk in its continued receipt of settlement payments if the ability of participating manufacturers to make the payments were threatened by a requirement that the manufacturers immediately pay massive awards of punitive damages.”
 
 See
 
 Fla. CS for SB 1720 (2000) (First Engrossed) (providing legislative intent for section 768.733 as recognized in Fla. S. Jour. 1442 (Reg. Sess. 2000));
 
 see also
 
 Fla. H.R. Comm. on Fin. Servs. CS/HB 1721
 
 [5]
 
 Staff Analysis 1, 4 (final July 13, 2000) (on file with comm.) (explaining that section 768.733 was part of a comprehensive bill designed to protect the state’s proceeds under the FSA, and noting that “[wjhile the tobacco settlement payments are to be made in perpetuity, there is concern by some that the companies may declare bankruptcy and default on their obligations” because of lawsuits such as
 
 Engle).
 

 In 2003, the Legislature enacted section 569.23. This statute established a $100 million cap on the bond or other security that a signatory to the FSA had to post in order to obtain a stay of any judgment pending appeal.
 
 See
 
 § 569.23(1), Fla. Stat. (2003) (cross-referencing section 215.56005(1)(f), which defined “tobacco settlement agreement” to mean “the settlement agreement, as amended, entered into by the state and participating cigarette manufacturers in settlement of
 
 State of Florida v. American Tobacco Co.,
 
 No. 95-1466 AH, 1996 WL 788371 (Fla. 15th Cir. Ct.1996)”). As was the case with section 768.733, the enactment of section 569.23(3) was based on concerns that the FSA signatories might default on their obligations to
 
 *1088
 
 the State if they could not afford the bond required to stay an extremely large money judgment pending appeal.
 
 See
 
 Fla. S. Comm, on Judiciary SB 2826
 
 [6]
 
 Staff Analysis 3 (Apr. 18, 2003) (on file with comm.).
 

 Section 569.23 was amended in 2009 in response to the Florida Supreme Court’s decision in
 
 Engle,
 
 which had the practical effect of decertifying the class in that case. The legislative staff analysis for the 2009 amendments explained:
 

 In 2006, the Florida Supreme Court de-certified a class action lawsuit
 
 [Engle
 
 ] but authorized the members of the class to bring individual lawsuits within a certain time period. As a result of this case, there are approximately 3,000 separate lawsuits in which damages may be awarded. Prior to this decertification, the class action suit would have been covered by the supersedeas bond cap in s. 569.23, F.S. However, the separate 3,000 cases are not currently covered by s. 569.23, F.S., which would mean that the tobacco companies may have to post supersedeas bonds in up to 3,000 separate cases that could cumulatively total billions of dollars.
 

 Fla. S. Comm. on Judiciary CS/SB 2198
 
 [7]
 
 Staff Analysis 5 (Apr. 23, 2009) (on file with comm.);
 
 see also id.
 
 at 3 (noting that the cost of the individual and class action lawsuits against the FSA signatories is a factor affecting the stability of the tobacco settlement payments).
 

 The 2009 amendments retained and revised the $100 million bond limit created in 2003.
 
 See
 
 § 569.23(2), Fla. Stat. (clarifying that the $100 million is cumulative for all appellants). The amendments also added a new subsection (3), which provides in pertinent part:
 

 (a)l. In civil actions against a signatory, or a successor, parent, or affiliate of a signatory, to a tobacco settlement agreement brought by or on behalf of persons who claim or have been determined to be members of a former class action that was decertified in whole or in part, the trial courts shall automatically stay the execution of any judgment in any such actions during the pendency of all appeals or discretionary appellate reviews of such judgment in Florida courts, upon provision of security as required in this paragraph. All security shall be provided through the posting with or payment into the registry of the clerk of the Supreme Court.
 

 2. The total amount of security that must be provided for all appellants collectively with regard to a single judgment is equal to the lesser of the amount of the judgment to be stayed or the amount of security per judgment required based on the following tiers of judgments on appeal in the courts of this state at the time the security is provided:
 

 TIER— NUMBER OF JUDGMENTS AMOUNT OP SECURITY PER JUDGMENT MAXIMUM TOTAL ALL SECURITY
 

 1-40 $5,000,000 $200,000,000
 

 41-80 $2,500,000 $200,000,000
 

 81-100 $2,000,000 $200,000,000
 

 101-150 $1,333,333 $109,999,950
 

 151-200 $1,000,000 $200,000,000
 

 201-300 $ 666,667 $200,000,100
 

 301-500 $ 400,000 $200,000,000
 

 501-1,000 $ 200,000 $200,000,000
 

 1,001-2,000 $ 100,000 $200,000,000
 

 2,001-3,000 $ 66,667 $200,001,000
 

 3. In cases having multiple defendants, an individual appellant shall provide security in proportion to the percent or amount of liability specifically allocated against that appellant in the judgment,
 
 *1089
 
 or, if liability is not specifically allocated in the judgment, for a share of the unallocated portion of the judgment determined by dividing the unallocated portion of the judgment equally among all defendants against whom the judgment is entered. Once an appellant has provided its required security with respect to a judgment, that appellant is entitled to a stay of that judgment regardless of whether other defendants in that case have provided the security required of them.
 

 4. When the number of judgments on appeal changes so that the total is within a higher or lower tier, the amount of security required in each case shall change by operation of law, upon notice provided by any party to all other parties and upon deposit within 30 days after notice of any additional security required hereunder, from the amount of security previously posted to an amount consistent with the statutory appeal bond rights prescribed in this paragraph ....
 

 [[Image here]]
 

 (c) A claim may not be made against the security provided by an appellant unless an appellant fails to pay a judgment in a case covered by this subsection within 30 days after the judgment becomes final. For purposes of this subsection, a judgment is “final” following the completion of all appeals or discretionary appellate reviews, including reviews by the United States Supreme Court. If an appellant fails to pay a judgment within such time period, the security for that judgment provided by that appellant shall be available to satisfy the judgment in favor of the appellee. Upon satisfaction of the judgment in any case, the clerk of the Supreme Court may refund any security on deposit with respect to that ease to the appellant upon an order from the trial court confirming satisfaction of the judgment.
 

 § 569.23(3), Fla. Stat.
 

 Section 569.23(3) has two main components. First, it provides that, upon posting a bond or other security in accordance with the statute, a signatory to the FSA is entitled to an automatic stay of the judgment in any civil case brought by or on behalf of a person who was a member of a decertified class action. § 569.23(3)(a)l., Fla. Stat. Second, and most pertinent to the issue framed by Appellee’s motion for review, the statute limits the amount of security that the signatory is required to post in order to obtain the automatic stay provided by the statute. § 569.23(3)(a)2., Fla. Stat. The limit is tied to the number of cases on appeal, subject to a cumulative cap of $200 million.
 
 Id.
 
 Currently, there are less than 40 judgments on appeal, so the maximum security required to obtain a stay under the statute is the lesser of the amount of the judgment or $5 million.
 

 The statute also imposes several reporting and record retention requirements on the FSA signatories and the Clerk of the Florida Supreme Court.
 
 See
 
 § 569.23(3)(e), Fla. Stat. This information is maintained on the supreme court’s website.
 
 See
 
 http://www.floridasupremecourt. org/clerk/bonds.shtml.
 

 With this background in mind, we turn to Appellee’s claims that section 569.23(3) is unconstitutional.
 

 Section 569.23(3) is Presumed Constitutional
 

 Like any other statute, section 569.23(3) comes to this court with a presumption of constitutionality.
 
 In re Estate of Caldwell,
 
 247 So.2d 1, 4 (Fla.1971). All reasonable doubts as to the validity of the statute are to be resolved in favor of constitutionality.
 
 Id.
 
 Also, the court is required to give deference to classifications
 
 *1090
 
 contained in the statute and such deference “•will be observed in all cases where the court cannot say on its judicial knowledge that the Legislature could not have had any reasonable ground for believing that there were public considerations justifying the particular classification and distinction made.”
 
 Lewis v. Mathis,
 
 345 So.2d 1066, 1068 (Fla.1977).
 

 Section 569.23(3) is not a Special Law
 

 Appellee contends that section 569.28(3) is a special law and that it violates article III, section ll(a)(12) because of its narrow application and the benefits it grants to RJR and the other FSA signatories. We reject this claim.
 

 Article III, section ll(a)(12) provides that “[tjhere shall be no special law ... pertaining to ... grant of privilege to a private corporation.” This provision operates as a limitation on the authority of the Legislature and, thus, a law passed in contravention of this limitation is unconstitutional.
 
 See Lawnwood Med. Ctr., Inc. v. Seeger,
 
 990 So.2d 503, 509 (Fla.2008) (invalidating a statute that provided a special benefit to a single hospital and holding that the term “privilege” is not limited to economic benefits).
 

 The parties disagree on whether section 569.23(3) is a special law. If the statute is a special law, then it is subject to the limitations in article III, section 11; if, however, the statute is a general law, then article III, section 11 is not applicable. Thus, before considering whether section 569.23(3) has the effect of granting a “privilege” to the FSA signatories, it is necessary to consider the threshold question of whether the statute is a general or special law.
 

 The Florida Supreme Court has explained that a special law is “one relating to, or designed to operate upon, particular persons or things, or one that purports to operate on classified persons or things when classification is not permissible or the classification adopted is illegal.”
 
 Id.
 
 (quoting
 
 Dep’t of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass’n,
 
 967 So.2d 802, 807 (Fla.2007)). By contrast, a general law is “a statute relating to ... subjects or to persons or things as a class, based on proper distinctions and differences that inhere in or are peculiar or appropriate to the class.”
 
 Id.
 
 (quoting
 
 State ex rel. Gray v. Stoutamire,
 
 131 Fla. 698, 179 So. 730, 733 (1938));
 
 see also Dep’t of Bus. & Prof'l Regulation v. Classic Mile, Inc.,
 
 541 So.2d 1155, 1157 (Fla.1989) (“A law that operates universally throughout the state, uniformly on subjects as they may exist throughout the state, or uniformly within a permissible classification is a general law.”).
 

 Appellee contends that section 569.23(3) is a special law because it applies only to the five tobacco companies that signed the FSA and the plaintiffs in the
 
 Engle
 
 progeny cases. The narrow scope of section 569.23(3) is not necessarily dispositive of whether the statute is a special law because the Florida Supreme Court has explained that “a law does not have to be universal in application to be a general law if it materially affects the people of the state.”
 
 St. Johns River Water Mgmt. Dist. v. Deseret Ranches of Fla. Inc.,
 
 421 So.2d 1067, 1069 (Fla.1982);
 
 see also Schrader v. Fla. Keys Aqueduct Auth.,
 
 840 So.2d 1050 (Fla.2003) (concluding that a law applicable only in Monroe County was a general law, not a special law, because it served an important and necessary purpose and had statewide impact). Indeed, the supreme court has previously found statutes that have a narrow application to be general laws, rather than special laws, where the statute served an important statewide purpose.
 
 See Schrader,
 
 840 So.2d at 1055-56 (citing cases).
 

 
 *1091
 
 For example, in
 
 Department of Legal Affairs v. Sanford-Orlando Kennel Club,
 

 [8]
 

 the supreme court upheld a statute that benefitted a single pari-mutuel racing facility. The court rejected the contention that the law’s narrow scope transformed it from a general law into a special law, reasoning that:
 

 A general law operates uniformly, not because it operates upon every person in the state, but because every person brought under the law is affected by it in a uniform fashion. Uniformity of treatment within the class is not dependent upon the number of persons in the class.
 

 Id.
 
 at 881. In upholding the statute, the court explained that the State “has a legitimate pecuniary interest in racing because of the substantial revenue it receives from pari-mutuel betting” and that the classification in the statute was directly related to this interest.
 
 Id.
 
 at 881-82. The significance of the statute’s purpose to the decision upholding the statute was emphasized by the last paragraph of the opinion, which stated:
 

 This state’s interest in recreational racing and wagering is substantial. Not only does it enhance the tourist industry by providing entertainment and interest to our visitors, but the tax revenues have significantly aided our statewide programs. We find it very appropriate for the legislature to assist this industry as it would any other in like circumstances.
 

 Id.
 
 at 883.
 

 Likewise, in this case, we agree with RJR that the protection of the State’s pecuniary interest in the revenue stream under the FSA is a matter of significant statewide importance and that the bond limitations in section 569.23(3) are reasonably related to this important state interest. The significant revenues from the FSA are used to fund a variety of state programs and, according to the papers filed by the Attorney General in the trial court, “[i]f that revenue stream is disrupted by the financial instability of the companies due to a requirement to post exorbitantly large bonds, the fiscal health of the State may be threatened and important programs providing essential support to Florida citizens will be at risk.” It is not for us to say whether the Legislature could have or should have chosen other means to achieve this end; rather, as noted above, in evaluating a claim that a statute is a special law because of its narrow focus, we must give deference to the classifications in the statute unless we can say that the Legislature “could not have had any reasonable ground for believing that there were public considerations justifying the particular classification and distinction made.”
 
 Lewis,
 
 345 So.2d at 1068. Here, the importance of the FSA revenue stream to the State and the prospect of a multitude of individual multi-million jury awards against the FSA signatories (whether arising out of
 
 Engle
 
 or other decertified class actions) provides an adequate justification for the narrow focus of the section 569.23(3).
 

 The supreme court also explained in
 
 Sanford-Orlando Kennel Club
 
 that it did not matter that the members of the Legislature knew that the statute would benefit a single facility or that, once passed, the law only benefitted one facility.
 
 See
 
 434 So.2d at 882. Rather, the “controlling point” was whether the statute had the potential to apply to other facilities in the future.
 
 Id.; see also Dept. of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass’n, Inc.,
 
 912 So.2d 616, 621-22 (Fla.
 
 *1092
 
 2005) (“Whether a statute is a special law depends on its potential applicability to others who may come within the regulated class.... The critical question is not one of legislative intent; rather, it is whether the class regulated by the statute is open.... [T]he proper standard is whether there is a reasonable possibility that the class will include others.”);
 
 St. Vincent’s Med. Ctr. v. Mem’l Healthcare
 
 Grp.,
 
 Inc.,
 
 967 So.2d 794, 802 (Fla.2007) (“[WJhether a law has general application turns on a determination of whether its application to others is reasonable or practical, not theoretical or speculative. The question of general application is not to be guided by irrational speculation that anything is possible”).
 

 Section 569.23(3), like the statute at issue in
 
 Sanford-Orlando Kennel Club,
 
 was specifically intended to apply to the
 
 Engle
 
 litigation and, at the time of its passage, the scope of the statute’s application was limited to that litigation. This is clear from the statute’s legislative history. However, the statute is not limited to judgments entered in favor of
 
 Engle
 
 plaintiffs; it applies in any civil case against an FSA signatory brought by or on behalf of a member of a decertified class action. It is not unreasonable to expect that the FSA signatories, which include the nation’s four largest tobacco companies, may be the subject of other class actions that end up being decertified. Indeed, due to the tobacco industry’s reputation as a deep-pocket defendant and “a present-day popular villain,”
 
 [9]
 
 the likelihood that section 569.23(3) will have a broader application than the
 
 Engle
 
 progeny cases is certainly not theoretical or speculative; thus, the class of cases subject to the statute is not closed.
 

 In sum, we conclude that section 569.23(3) is a general law, not a special law. Accordingly, the provisions of article III, section 11 are not implicated and it is not necessary to consider whether, under
 
 Lawnwood Medical Center,
 
 the bond limitation in section 569.23(3) is a “privilege” granted to the FSA signatories.
 

 Section 569.23(3) Does Not Violate Separation of Powers
 

 Appellee also contends that section 569.23(3) violates the separation of powers mandate in article II, section 3
 
 [10]
 
 because the statute addresses a purely procedural matter over which the Florida Supreme Court has exclusive rulemaking authority under article V, section 2(a). We reject this claim.
 

 Article V, section 2(a) provides in pertinent part that “[t]he supreme court shall adopt rules for the practice and procedure in all courts.... ” This provision gives the Florida Supreme Court authority to adopt procedural rules; it does not authorize the court to make substantive law. Conversely, this provision, in conjunction with article II, section 3, prohibits the Legislature from enacting purely procedural statutes.
 
 See State v.
 
 Raymond, 906 So.2d 1045, 1048-49 (Fla.2005) (declaring statute unconstitutional under article II, section 3 because it created a new procedural rule). The line between procedure and substance is fuzzy, at best, and “[tjhe entire area of substance and procedure may be described as a ‘twilight zone’ and a statute or rule will be characterized as substantive or procedural according to the nature of the
 
 *1093
 
 problem for which a characterization must be made.”
 
 In
 
 re
 
 Florida Rules of Criminal Procedure,
 
 272 So.2d 65, 66 (Fla.1972) (Adkins, J., concurring).
 

 Appellee contends that section 569.23(3) impermissibly intrudes upon the supreme court’s rulemaking authority because the circumstances under which a judgment may be stayed pending appeal is a purely procedural matter. RJR responds that the establishment of a limitation on the amount of bond required to stay a judgment pending appeal is a substantive matter within the purview of the Legislature. We need not wade into the murky waters of procedure verses substance to resolve this case because, even if granting a stay pending appeal is a procedural matter, the stay rule adopted by the supreme court expressly contemplates that the requirements for obtaining a stay may be established by general law.
 

 Rule 9.310(a) provides that
 
 “...
 
 a party seeking to stay a final or non-final order pending review shall file a motion in the lower tribunal, which shall have continuing jurisdiction, in its discretion, to grant, modify, or deny such relief.” Thus, the rule establishes how a stay is to be obtained (by filing a motion), where the motion is to be filed (in the trial court), and what authority the trial court has upon receipt of the motion (to grant, modify, or deny a stay). However, the rule also recognizes that general law and the rule itself may provide different requirements for obtaining a stay because the language quoted above is preceded by a clause stating “[e]x-cept as provided by general law and in subdivision (b).” Fla. R.App. P. 9.310(a);
 
 see also BDO Seidman,
 
 998 So.2d at 2 (recognizing that “Rule 9.310(a) expressly authorizes modifications to its terms as ‘provided by general law’ ”);
 
 In re Proposed Florida Appellate Rules,
 
 351 So.2d 981, 1010 (Fla.1977) (stating in the commentary to rule 9.310 that “[t]he rule preserves any statutory right to a stay”).
 

 Section 569.23(3) clearly falls within the “except as provided by general law” clause. The statute — which, as discussed above, is a general law — establishes different requirements for obtaining a stay of a judgment entered against a signatory to the FSA in certain types of cases. The statute operates similar to rule 9.310(b)(1) in that it provides for an automatic stay of the judgment upon the posting of a bond; but it also establishes limits on the amount of the bond required to secure the stay. The establishment of limits on the amount of the bond required for a stay pending appeal is a substantive matter within the purview of the Legislature and, thus, section 569.23(3) does not impermissibly intrude on the authority granted to the Florida Supreme Court by article V, section 2(a).
 

 Our sister court came to the same conclusion in
 
 BDO Seidman.
 
 In that case, the Third District rejected a constitutional challenge to the $50 million bond cap in section 45.045, Florida Statutes.
 
 See
 
 998 So.2d at 2. The court noted that the statute “concerns substantive rights to property and to appeal,”
 
 id.,
 
 and it reasoned that “since the legislature holds the power to preclude stay of payment, it likewise holds the power to limit the amount required to secure a payment stay.”
 
 Id.
 
 at 3.
 

 BDO Seidman
 
 relied on
 
 St. Mary’s Hospital, Inc. v.
 
 Phillipe,
 
 [11]
 
 in which the supreme court rejected a constitutional challenge to a statute that eliminated the trial court’s discretion to stay a medical malpractice arbitration award because, under rule 9.310(a), the court’s discretion was subject to exceptions in general law.
 
 See
 
 
 *1094
 
 769 So.2d at 966-67. Although the supreme court ultimately grounded its decision upholding the statute on the fact that the parties agreed to participate in the arbitration process that included the challenged statute, the court clearly recognized the Legislature’s authority to impose limitations on the trial court’s authority to grant stays when it observed that rule 9.310(a) “gives the trial court discretion to enter a stay subject to exceptions ...
 
 ‘by general law.’” Id.
 
 at 966 (emphasis in original).
 

 Appellee contends that
 
 BDO Seidman
 
 was “wrongfully decided” because it conflicts with the Florida Supreme Court’s decision in
 
 Wait v. Florida Power & Light Co.
 

 [12]
 

 We disagree.
 

 The issue in
 
 Wait
 
 was whether the provisions in the predecessor to rule 9.310 granting public bodies an automatic stay upon filing a notice of appeal controlled over a statute providing that an order requiring an agency to open its records for inspection under the Public Records Act is not stayed by the agency’s filing of a notice of appeal.
 
 See id.
 
 at 422. In the decision under review by the supreme court in
 
 Wait,
 
 this court had held that the statute controlled because the rule was intended to protect the public treasury from money judgments and to allow the agency’s notice of appeal to operate as a stay in a Public Records Act case would “delay a person’s right to examine public records until through the sheer lapse of time, the need expired[, which] would defeat the purpose of the Public Records Act.”
 
 Wait v. Florida Power & Light Co.,
 
 353 So.2d 1265, 1267 (Fla. 1st DCA 1978). The supreme court quashed this court’s decision, and held that the rule controlled over the statute, stating that the “granting of a stay, because it is a step in the enforcement of a final judgment, is concerned with ‘the means and method to apply and enforce’ substantive rights and falls within the definition of procedural law.”
 
 Wait,
 
 372 So.2d at 423.
 

 Wait
 
 is not controlling here.
 
 Wait
 
 did not involve rule 9.310; it involved the predecessor to that rule, Florida Appellate Rule 5.12(1), and the opinion made a specific point of noting that “[t]he present decision is limited to the relationship between section 119.12(2) and the ‘Florida Appellate Rules, 1962 Revision.’”
 
 Id.
 
 at 423 n. 2. Rule 5.12(1) did not include the “except as provided by general law” clause contained in the current rule 9.310(a); nor was this language included in any of the other 1962 rules concerning stays pending appeal.
 
 See
 
 Fla. App. R. 5.1-5.12 (1962 rev.). The “except as provided by general law” language was added when rule 9.310 was created as part of the comprehensive 1977 revision of the appellate rules and, based on the commentary to the new rule approved by the Florida Supreme Court, it is clear that this language was specifically intended to “preserve[ ] any statutory right to a stay.”
 
 In re Proposed Florida Appellate Rules,
 
 351 So.2d at 1010;
 
 see also St. Mary’s Hospital,
 
 769 So.2d at 968-69 (recognizing that the trial court’s authority under rule 9.310(a) is subject to exceptions created by general law).
 

 We recognize that in
 
 Department of Highway Safety and Motor Vehicles v.
 
 Begley,
 
 [13]
 
 we stated that the “except as provided by general law” language in rule 9.310(a) was a reference to “the legislature’s power to designate when and where a motion to stay must be filed, not ... a reference to the authority and discretion of the court to grant a stay” and that it would be inconsistent with the reasoning in
 
 Wait
 
 to interpret the rule language “as a broad
 
 *1095
 
 grant of authority [to the Legislature] to Override the entire rule.”
 
 Id.
 
 at 279.
 
 Begley
 
 has no impact on our disposition of this case.
 

 First, the discussion of rule 9.310(a) in
 
 Begley
 
 was dicta because our decision upholding the statute at issue in that case (which prohibited the trial court from staying the suspension of a driver’s license during judicial review) was based on our agreement with the Third District that “the determination of whether a party may drive pending a decision related to the suspension of the driver’s license is a decision which may be made by the legislature.”
 
 Id.; see also id.
 
 (“Since mandatory suspension is not a criminal penalty, but instead a civil sanction unrelated to an appeal of the criminal conviction, the trial court does not have jurisdiction to enter a stay.”) (quoting
 
 Dept. of Highway Safety & Motor Vehicles v. DeGrossi,
 
 680 So.2d 1093, 1095-96 (Fla. 3d DCA 1996)).
 

 Second,
 
 Begley
 
 was issued prior to the Florida Supreme Court’s decision in
 
 St. Mary’s Hospital.
 
 The opinion in
 
 Begley
 
 was issued on May 8, 2000, and rehearing was denied on June 2, 2000; the opinion in
 
 St. Mary’s Hospital
 
 was not issued until June 29, 2000. Thus, the
 
 Begley
 
 court did not have the benefit of the supreme court’s recognition in
 
 St. Mary’s Hospital
 
 that the trial court’s authority under rule 9.310(a) is subject to exceptions created by general law.
 

 Third,
 
 Begley
 
 is distinguishable because that case involved a statute (like the statute in
 
 Wait)
 
 prohibiting the trial court from granting a stay. By contrast, the statute at issue in this case (like the statute in
 
 BDO Seidman)
 
 simply limits the amount of the bond that is required to obtain a stay pending review. Thus, this case is more similar to
 
 BDO Seidman
 
 than it is to
 
 Begley.
 

 In sum, we conclude that section 569.23(3) does not impermissibly intrude on the Florida Supreme Court’s rulemak-ing authority under article V, section 2(a) and, therefore, the statute does not violate the separation of powers mandate in article II, section 3.
 

 Conclusion
 

 For the reasons stated above, we hold that section 569.23(3) is constitutional and we affirm the trial court’s order denying Appellee’s motion to determine the sufficiency of the bond posted by RJR pursuant to the statute. We recognize that the issues framed by Appellee’s motion implicate significant public policy issues of statewide importance because there are thousands of
 
 Engle
 
 progeny cases pending around the state and there are an increasing number of multi-million dollar judgments in excess of the thresholds in section 569.23(3) being entered and appealed in those cases. Accordingly, because the issues in this case are likely to continue to arise around the state until the issues are definitively resolved by the Florida Supreme Court, we also certify the following question of great public importance to the supreme court:
 

 DOES SECTION 569.23(3), FLORIDA STATUTES (2010), VIOLATE ARTICLE III, SECTION ll(a)(12) OR ARTICLE II, SECTION 3 OF THE FLORIDA CONSTITUTION BY LIMITING THE AMOUNT OF THE BOND NECESSARY TO OBTAIN AN AUTOMATIC STAY OF A JUDGMENT AGAINST A SIGNATORY TO THE TOBACCO SETTLEMENT AGREEMENT WITH THE STATE OF FLORIDA?
 

 STAY ORDER AFFIRMED; QUESTION CERTIFIED.
 

 LEWIS and ROBERTS, JJ., concur.
 

 [1]
 

 .
 
 Engle v. Liggett Group, Inc.,
 
 945 So.2d 1246 (Fla.2006).
 

 [2]
 

 .
 
 R.J. Reynolds Tobacco Co. v. Clay,
 
 No. 1D10-5544 (Apr. 12, 2011) (affirming order denying motion to determine sufficiency of bond).
 

 [3]
 

 . 998 So.2d 1 (Fla. 3d DCA 2008),
 
 rev. denied,
 
 996 So.2d 211 (Fla.2008).
 

 [4]
 

 . We have jurisdiction even though we affirmed the judgment in this case
 
 (see
 
 2011 WL 1938199) and RJR filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court.
 
 See City of Miami v. Arostegui,
 
 616 So.2d 1117, 1119 (Fla. 1st DCA 1993). The issue framed by the motion was not rendered moot by our decision affirming the judgment because the stay provided by section 569.23(3) extends “during the pendency of all appeals or discretionary appellate reviews of such judgment in Florida courts.” § 569.23(3)(a)1., Fla. Stat.
 

 [5]
 

 . CS/HB 1721 became chapter 2000-128, Laws of Florida, which enacted section 768.733.
 

 [6]
 

 . SB 2826 became chapter 2003-133, Laws of Florida, which enacted section 569.23.
 

 [7]
 

 . CS/SB 2198 became chapter 2009-188, Laws of Florida, which included the amendments to section 569.23.
 

 [8]
 

 . 434 So.2d 879 (Fla.1983).
 

 [9]
 

 .
 
 Philip Morris, Inc. v. French,
 
 897 So.2d 480, 487 (Fla. 3d DCA 2004),
 
 rev. denied,
 
 918 So.2d 292 (Fla.2005).
 

 [10]
 

 . "The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."
 

 [11]
 

 . 769 So.2d 961 (Fla.2000).
 

 [12]
 

 . 372 So.2d 420 (Fla.1979).
 

 [13]
 

 . 776 So.2d 278 (Fla. 1st DCA 2000).